Thank you, Judge Hurwitz, and may it please the Court. Gregory Gar on behalf of Defendants Starkist and Chicken of the Sea, with the Court's permission, I'd like to reserve four minutes of my time for rebuttal. We'll try to help you. Thank you, Your Honor. Your Honors, the District Court in this case certified three classes of direct and indirect purchasers of Defendants' tuna products, which all told encompassed hundreds of direct purchasers and millions of indirect purchasers from all across the United States. The central problem is that the members of those classes varied widely in highly individualized ways, such as in their size, bargaining power, retail strategies that affected the prices that they paid for tuna, and ultimately whether or not they were impacted at all by the alleged conspiracy. Plaintiffs tried to paper over that problem by adopting averaging assumptions that wiped out these individualized differences by assuming that every single member of the class suffered the same average overcharge as the class as a whole, and that in the case of the indirect purchasers, that that average overcharge was passed on in its entirety to everyone. That's true whether the purchaser... Mr. Garland, let me ask you what I think to me is important. Maybe I'm wrong about this. The question at this stage is whether there's common proof of injury to the class, not whether each member of the class was damaged in the same way. And so why wasn't there common proof? You can see that averaging can be used to show common proof. Why wasn't there sufficient evidence here of common proof with respect to injury to each of the individual classes, even if later on we might have to sort out how much damage each individual class member had or indeed whether each individual class member was damaged? And so one more point on this. Your expert says, for example, with respect to the... He thinks only 70% of the class, maybe it's the direct buyer class. He thinks only 70% of the class actually suffered damage. But it strikes me that that means that there's probably a common way of proving the aggregate damage to the class. So respond to that for me, if you will. I'll give you an open-ended question. So first, Your Honor, you're right. There's a difference between impact, whether they've been harmed at all by the conspiracy and the extent of that impact and damages. But to establish predominance, Your Honor, with respect to impact, they have the burden of coming forward to show that they can show that all or nearly all of the class members... Stop there. Where do I find that in the case law, that they have the burden of showing all or nearly all? Or isn't the case law instead of predominance issue of management of the trial? What does it say, all or nearly all? So a couple of things, Your Honor. First, I would look to Tyson Foods, and that'll tell you that to establish predominance, they have to come forward with a method of common proof to establish the element. And the element here I'm talking about is impact. You said all or nearly all. That's why I stopped you. And I'm trying to find in the case law something that says they have to come with a predominance to show that all or nearly all of the people in the class suffered an injury. That's not in the case law, is it? It is, Your Honor, to establish predominance with respect to impact. And I think the rail freight case of the D.C. Circuit addresses this most clearly. But we cite other cases in our briefs that to establish predominance with respect to impact, they have to show impact with respect to all or nearly all. Now, the district court conceded that if 28 percent of the class, here we're talking about the direct purchaser class, did not suffer injury, as Dr. Johnson testified, then that class could not be certified. Plaintiff's own model with respect to the direct purchaser class couldn't establish injury with respect to 5.5 percent. That itself is right close to the... Why does that govern here? Some courts have said that it's only limited to wage and hour cases. Justice Thomas, in his dissent, I think said the same as well. Why is that case governing in this case? So, Your Honor, it's governing because it establishes the general rule, which is that representative evidence isn't allowed in a class action unless that evidence would be allowed to sustain a principle in an individual action. What was unique about Tyson's Foods, Your Honor, was the substantive rule of law that allowed the addition, the introduction of representative evidence in that case, which was the Mount Clemens rule. And that rule is limited to the FLSA context. Other courts have recognized that the Tyson's Foods principle does extend to other cases, including antitrust cases. I would point you to the First Circuit decision in the Assacol case, the Third Circuit decision in the Lamictal case, both of which were antitrust actions. But you're right, Your Honor. Counsel, I'm sorry, did the district court comply with Tyson's Foods in this case? Are you arguing she did not? We're absolutely arguing that she did not and that the representative evidence cannot be allowed in this case because it could not be allowed to establish the element of impact in any individual action. No individual member of the class, regardless of their purchasing power, strategies, or anything else, could come into court in an impacted because if you look at all the hundreds of direct purchasers and you take the average of all of them, the class as a whole suffered a 10.28% overcharge. They couldn't do that. They would have to show that they themselves suffered that overcharge. And that's why- That's my question about the Tyson's. What's the rule that comes out? There has to be used in individual trial. Does it just have to be admissible in individual trial or does it actually have to prove impact in individual trial? Or is it- I think that Tyson's even suggested that no reasonable juror would believe that evidence. So what actually has to be proven in individual trial? So, Your Honor, what Tyson's Foods said, and this is a critical point, it's not a question of mere admissibility. What the court said at pages 1047 to 48 of the Supreme Court Reporter is that the representative evidence would have to be sufficient to sustain a jury finding on the element in question. And so with respect to that issue, the court in Tyson's Foods looked to substantive law and held that under the Mount Clemens case, in an individual action, the workers in that case would be allowed to rely on the representative evidence there. The averaging of the 18 minutes time spent donned and doffing. But here we don't have any substantive rule of law that would allow the introduction of representative evidence in individual actions. And here's something critical is missing. In Tyson's Foods, the court distinguished between the workers in Tyson's Foods who worked in the same plant, under the same conditions, and under the same policy, and the workers in the Walmart case who worked at stores all across the country under different supervisors and individualized circumstances. And the court explained that in Walmart, there's no way that the individuals there could have relied on the representative evidence, which was statistical studies of the disparity between promotions for women and men, because the plaintiffs there were not similarly situated. And our case is exactly like Walmart and unlike Tyson's Foods. Tell you what concerns me, it's not exactly like Walmart, because we're talking here about what antitrust law tells us is forbidden, which is a fixed price, which means that people in the chain of consumption are going to pay more than they would have had there been free and open competition. And the expert says, I can tell how big the overcharge was to each of these classes, because I can look at what the charge would have been in the absence of price fixing, and see what the charges were after price fixing. Now, each individual person may not be able to show that he was overcharged. That's a damage claim. But if we're looking for damage to the class here, why isn't that enough? Again, your honor, they have to come forward with common proof that all or nearly all suffered impact. And it's again, where you find the all or I've asked you a couple times, what do you find I would point your honor to the rail freight case of the DC circuit, which discusses that in terms of the the extent of uninjured members of the class. And again, I mean, 5.5%, which is undisputed here with respect to the the direct purchaser class is, you know, just close to the line, but they have to come forward with that common means. And here, it's undisputed that some members of the class here, we're talking about direct purchasers suffered no harm at all. All of these prices were individually negotiated. I mean, we set forth the pages six to nine of our opening brief. You know, I have a question about that. I have a question about that. It looked to me as though there would be a big difference between people who paid list price and people who paid negotiated prices. I was thinking Walmart, they're never going to pay a list price. I think they've even opted out in this case, but not all of the big direct purchasers have opted out. On the other hand, some little bodega with just one owner, they're either going to pay the list price, or if there's a special promotion going on, maybe they'll buy a little more tuna fish at the promotional price. Big difference there. I would think that for the bodegas, the harm from a conspiratorially fixed list price would be obvious and common. Lumping them in with people that never pay list, they never pay retail, as it were, would be distorting. And I can't figure out exactly who was lumped in with who, and whether we have to concern ourselves with the risk of lumping in people who never pay retail with people who always pay retail. Your Honor, I think you're exactly right about the risk of lumping in, because these classes are extraordinarily broad. Now, with respect to the direct purchasers, that class includes mega conglomerates like Amazon, Target, Costco, and includes corner delis across the United States, local grocery stores. Those purchasers vary greatly in terms their bargaining power, their promotions, the retail strategies they pursued, whether it be a loss leader strategy, a sticky price strategy, the way that some companies, some purchasers didn't start with the list price at all. They were negotiated, some were negotiated through a bid, and all of that is lumped together. And those individualized differences would preclude class certification, but the way that they tried to get around it was to adopt these crude averaging assumptions that simply assumes that notwithstanding all these individualized differences among these purchasers, that they all suffered the same average overcharge. No, see, but that's my problem, and I keep coming back to it. I don't think they were arguing that everybody suffered the same average. What they were arguing was that there was an aggregate harm on the class in that amount, and that the average person in the class would suffer that harm. Now, that may not be sufficient, but I don't think they, I don't think their argument was that every person's damages were the same. They were arguing there was a common method of proof of injury as opposed to a common method of proof of damages. Am I wrong about that? Your Honor, I agree that damages are different. We're not talking about damages. We're talking about whether they've been impacted. You keep coming back to damages, and that's, I'm trying to focus on injury. Yeah, I want to focus on impact, too, and so if I mention damages, I apologize, but they have to show a common method of showing that the class was impacted, suffering impact, and they haven't done that, and I would disagree with Your Honor's premise, which is that this averaging assumption doesn't apply to their methodology. It absolutely does. It applies in calculating who was impacted, and when our expert, Your Honor, allowed the average overcharge to vary by purchaser, he found, as Dr. Johnson, the case of direct purchasers, that Plaintiff's model couldn't establish impact with respect to 28% of the class, and again, the difference there was he allowed the average overcharge to vary by purchaser, and because, you know, another thing that's important to understand about this case, this isn't a case where the data was somehow missing. All of the sales data was purchased. Plaintiff's had that data, so again, this wasn't at all like Plaintiff's had the data. They manufactured a model where they tried to bring together common impact by adopting all of these averaging assumptions, which would not be allowed in an individual action, and even then, with all that, they couldn't establish impact with respect to 5.5%, but when our expert ran the model, and he allowed the average overcharge to vary by purchaser, he established that they couldn't establish impact with respect to 28% of the class, and even the district court acknowledged at page 16 of her decision that failing to show impact with respect to 28% of the class would, of course, doom certification of the class, and so this was a critical issue, Your Honor, and I think it applied not only with respect to the direct purchasers, but in the case of the indirect purchasers, you had sort of like the dual fatality here, because not only did they assume the average overcharge for the whole class, but they assumed that that average overcharge was passed on in its entirety to the end consumer, no matter whether the end consumer bought it at a convenience store down the street, or at a Costco, or a store that sold it in bulk, and there's no basis for adoption. Can you explain how the 10% overcharge number was arrived at? Did they just aggregate all the impact and just divide it by the number of class members? Is that correct? In essence, it was a pooled regression, Your Honor, for the direct purchasers, and in the case of the other classes as well, so that's how they arrived at that 10.28%. Again, it would be like saying that because scoring in the NFL is up 10.28% on average for the entire NFL, we can assume that scoring was up 10.2.8% for every team, or that in the case of even the lowly Washington football club, scoring was up by that much, or that it was up at all. Now, that makes no sense, and these averaging assumptions, representative evidence, allow a means of circumventing the strict requirements for class certification, including the predominance requirement that the Supreme Court has specifically cautioned against, in both the Walmart case... And you're right in thinking that predominance is the only issue in front of us today. Yes, Your Honor. It is. Let me ask you... Remind me what the criminal conspiratorial agreement was. That really helps determine whether the classes are appropriate. Sure. Did they just agree to fix list prices, or did it go beyond that? It was about the timing of list prices, Your Honor, but there are critical differences about this action and the criminal guilty pleas. One is that the criminal guilty pleas did not involve the element of antitrust impact, which is part of the civil requirement under the Clayton Act, and what is at issue here. Another is that the time periods covered were years different, and in some cases, the products were different. And so, you know... I'm not asking that. What I'm asking is, what are they supposed to have done? It was alleged price fixing, Your Honor, and really about the timing... Price fixing on list prices, or price fixing on negotiated prices, or what? The list that came out, but here, and this is a critical point, Your Honor, the record establishes that even though the defendants published lists from time to time, the prices actually paid were individually negotiated. Some defendants, some purchasers like Walmart and Dollar General... I don't know if I'm making my question clear. I must not be. The whole case flows from a price fixing agreement, partly admitted in the criminal cases, and I want to know what prices they agreed to fix that the lawsuit is based on, because that affects how the classes should be defined, and I'm not totally clear on what prices they're supposed to have agreed to fix. And I'm sorry if I'm not answering your question, Your Honor, but there was alleged agreement on the timing of releasing list prices for various packaged tuna products. And again, I mean, the criminal conspiracy involved different periods of time, but that's the show in this civil action that members of the action, every member was impacted by that conspiracy. And importantly, although... That's why I keep coming back to this, and I'm looking at the Vaccaro case just out of the circuit not very long ago, and I'm quoting, defendants argue that when damage calculations cannot be performed on a class-wide basis, predominance has not been reached. And the court rejects that argument and says, and says instead, if you can prove class-wide damages on that kind of basis, class-wide impact on that basis, we'll deal with damages separately. So why doesn't Vaccaro... Because Your Honor, we're not talking about the difficulty in proving damages, we're talking about whether or not they can establish that class members have been harmed at all, impacted by the alleged conspiracy, which is different. And, you know, many courts have held that these problems don't apply with respect to damages. No one has held that you don't have to meet predominance with respect to impact at all. And so Vaccaro is completely different. Vaccaro does say, though, that in order to use representative evidence, you have to show that it would be permissible in an individual action, because otherwise you'd be violating the Rules Enabling Act. You'd be enlarging plaintiff's right in a class action and diminishing or abridging defendant's right. So let me walk through the evidence here and tell me what I'm missing. Their expert says, applying a regression analysis, and therefore we're already way above my pay level, I can determine what the prices would have been but for the price-fixing conspiracy. And I can determine the prices that people actually paid on an average. And there's a difference between the two. Your expert says, nah, the difference is smaller. In some cases, your methods are wrong. But the judge, whose discretion we have to respect here, finds the plaintiff's expert reliable in his methods. So assuming that those facts, that he properly applied to that, why doesn't that enough to establish damage impact on the class members, even if some individual ones may not have paid the precise price that he talks about? Because, your honor, that that whole analysis begins and uses throughout the premise that every class member has suffered the same average overcharge as the class as the whole. No, it doesn't. He takes the overcharge and says, that's the entire overcharge to the class, and if you average it, it's X. I don't care what the average is. That's irrelevant right now, because, but doesn't he opine that the class was averaged, was damaged in an aggregate amount? The critical point of his analysis, your honor, was to use his average overcharge and then to explain, attempt to explain through the model, what percent of the class was actually impacted by the alleged conspiracy. Okay, and now that leads to my next question, which wasn't the conclusion about what percent of the class was impacted, an entirely separate analysis from the average amount that he came up with. No, it wasn't, your honor, because I can walk through his analysis, your honor. He starts with pooled regression that gives him the 10% overcharge, and then he uses that to calculate what he calls a predicted actual price. He then subtracts the 10.28% overcharge, and then he compares that to the actual, actual price. And so, every step of the way, he's baked in that 10% overcharge, that average overcharge. That's my problem. If he has the real price, and he's arrived at a price that he thinks was inflated because of the antitrust conspiracy, let's assume he's right for a second. Isn't that enough to show impact? Isn't that enough to show injury to the class? It may be that an individual member paid less or more, but doesn't that, isn't that a common proof of injury to the class? No, no more than the statistical analysis in the Walmart case was common proof that different plaintiffs in different stores, subject to supervisors, were injured, your honor, because here you've got purchasers with widely different bargaining power, negotiating power, retail strategies. A Costco is going to approach pricing completely different than, you know, a deli corner market is. You know, all of these differences to which plaintiffs do not respond in their brief, we lay them out pages 6 to 12 of our brief, explains how they're completely different situations as to how individual purchasers would apply to the class. Dr. Johnson applied Mr. Magnum's model. He ran it, and he did one thing. He changed one thing. He allowed the average overcharge to vary by individual members of the class. The second question I'm quite not seeing is why are not these regression models usable in an individual trial? If the standard is, can it reasonably sustain a jury finding, or sustain of impact? So why couldn't it, why doesn't it meet the Tyson standard? So first of all, your honor, there's no substantive rule of law that would allow a plaintiff to rely on this representative evidence in this case, like there was with respect to Mount Clemens and the FLSA. There's no such rule. And second of all, the plaintiffs here are not at all similarly situated, which was the key plant and the plaintiffs in Walmart that worked under widely different situations. So it wouldn't be the case, and your honor, I mean, here's the kicker. There have been 100 direct, 100 individual actions filed by direct purchasers against defendants. In none of those cases did any of the plaintiffs attempt to rely on the average overcharge for the class as a whole to show how they had been impacted by the conspiracy. And that's because there's a hole. Do you agree though that this evidence would be admissible in the individual trial? I think, your honor, we haven't argued that it's inadmissible, but what I would say on that is Tyson's food and Walmart answers that. Because in Tyson's food, the court explained that, look, the representative evidence in Walmart might have been admissible, sure. But that doesn't mean that you could use it to manufacture predominance in a class action, because that evidence would not have been admissible to suffer discrimination through the statistical analysis. And that's, I mean, I think that's laid out well on pages 1047 to 48 in Tyson's food, where the court explains, you know, why the representative evidence was admissible there. You had a substantive rule of law allowing it, Mount Clemens, and similarly situated plaintiffs that worked in the same plant under the same condition, under the same policy. And here, like Walmart, you have widely different circumstances as to bargaining power, retail strategy, procurement strategies, whether to do it with a private label or not. I think you've answered Judge Bumate's question, and now we're going back to other points that were argued. We'll give you some time at the end for rebuttal. Thank you, your honor. Okay, Mr. Lepsock, you're up first. Thank you, your honor. So I've got 10 minutes, and to be clear now, I represent the direct purchaser plaintiffs, and my colleagues will handle a presentation for the jury. I'm going to focus mainly on something. It may just be a misunderstanding I have. I'm thinking by analog here. If you decided to take an individual vacation and you came to Fairbanks next year, stayed at a hotel, you'd pay rack rate, list price. If you went on a cruise and you stayed in Fairbanks, the rack rate would be totally irrelevant. Princess or whoever your cruise company was that you used, they'd negotiate a rate, and if the hotel said, well, our rack rate is $400 a night, they don't care. What they're comparing is not the rack rate and the discount. What they're comparing is what can they get for their cruise customers in this hotel versus what can they get for their customers in some other hotel, and it seems to me that that analogy applies here. If a bodega, not a chain, just a single bodega buys tuna fish to sell to its customers, they're going to pay list price unless there's a promotion going on, and maybe they can stall some purchasers till there's a sale. Just the way you might stall some clothing purchases till there's a sale, but if a big buyer is buying tuna fish, especially as soft as the tuna industry is, the list price doesn't even matter. Fixing the list prices doesn't matter. Delaying issuing the new list prices doesn't matter. What matters is what they can get tuna fish for from this company compared to what they can get tuna fish for from another company compared to what they can get substitutes for. For example, you go to Walgreens, the tuna fish is on the same aisle as the peanut butter and jelly, at least in my local Walgreens, and other snack foods that people might get for cheap dinners or cheap lunches, so you look at substitutes as all the economists did in this case. I don't understand why direct purchasers who pay list price so that the fixing of list prices or delay in issuing list price lists would matter. I don't see why they should be in the same class as people that never pay retail, people that never pay list price. Explain to me. I will. Okay, so let's first start with the evidence that was presented in this case and in our brief. Understand my question first. I do. Dr. Mangum's report sounds really complicated, but it really isn't. He just compares what prices were in a span of years before the price-fixing agreement to what they were afterwards, corrects for factors that would naturally affect them, and says the difference must be caused by the price-fixing agreement. The math is tricky to do that, but that's all it is. You've got that, but let me explain. I want to address your specific concern. I know you raised it with Mr. Garrett. Yeah, who pay retail with people who think it's a sin to pay retail. Right, so here's the answer. In this case, the evidence that was presented at the hearing before the district court was that all of the purchasers play in the same sandbox. The costs associated with production of these materials is the same, and Mike White, who was one of the defendants' employees, testified the list prices are the starting point, and that was undisputed. So that's in the record. Now, what did Dr. Mangum actually do? Why would the list prices be the starting point for a party that's negotiating any more than in the hotel example I gave, where Princess just doesn't care what the rack rate on the hotel is? It's irrelevant. Right, but that is, in fact, what the evidence in this case is, and we know it. We know it in this case because, first of all, let's talk about what Mangum did, and then I want to tell you about what Dr. Johnson did. What's the list price here is the starting point. I once bought a condo. The price that was listed was $147,000. I knew that no financing was available because less than $147,000 for a condo. List price just didn't matter to me. What mattered was comparable living facilities available. Okay, so Dr. Mangum did this pooled, market-wide approach, but he didn't stop there. He then did sub-regressions based on the various dimensions of the way that the defendants conduct their own business, the things that were important to them. All regression means is separating out factors. It's just a way to separate factors so you can figure out which of many factors made how much of a difference. Right. That's all it means. Yeah, so he did a sub-regression by customer type because these defendants actually categorized their customers into groupings, so discounters, mass merchandisers, full-service retailers like Kroger's and Safeway. He ran a regression specific to that, found large and particularly significant overcharges each way he looked at it. But we know for sure, the question here is simply about impact. It's not about the damages as Judge Hurwitz would say. Can we reliably, can we as judges and as parties, can we reliably have comfort that this market-wide approach is ultimately right that the market as a whole was impacted? And all we have to do is go back and see what the I don't see that. If all the tourists were, as an aggregate, paying more because the hotel keepers had gotten together an illegal deal to raise their rack rate, I can't see where it would matter to Princess Tours at all. Counsel, see if you can help me. Tell us what the evidence was in this case as opposed to what may be true with rack rates or other stuff. What was the about impact on members of the class that you represent? Other than generalized evidence of an aggregate overcharge. Right. So first thing, important thing for what Dr. Mangum did is he tested it by customer type. As the defendants defined their customer groups, he tested that all of the customer groups, including the big ones, large and statistically significant overcharges. Then what Judge Sammartino did. Okay, no, but stop, stop there. Tell me how he concluded that there were overcharges with respect to these constituent groups, other than simply dividing up the aggregate, his aggregate number among them. He ran a different sub regression. Other than this pooled regression, he ran a different sub regression based on customer type as the defendants categorized their customers into the local markets to the big retailers. He ran different regressions by each category. So again, because I'm not as good a mathematician as Judge Kleinfeld or probably anybody else in the room. I'm not either. I couldn't do it. I just know what it's for. So when you say he ran a regression, did he look at the prices those customers were paying before the conspiracy and look at the prices those customers were paying after the conspiracy? Whether or not they were negotiated prices or not, he said they're higher. And having taken out all the other factors, my opinion is the higher number is because of the conspiracy. Is that essentially what he did? That's true. And there is one more very, very important thing that we need to realize here. Dr. Johnson's methodology. That's the expert. Remember, he ran customer specific regressions. That's what we're talking about. Just how finally do you run those regressions? And Dr. Johnson went down to the customer level and ran the regressions. So if I understand if I understand Dr. Mangum's conclusion, it went like this. I can see what people were paying, even if they were negotiating, if they weren't paying this price before the conspiracy. I can see what they're paying after the conspiracy. I've tried to remove all other factors. And what I'm left with is a delta that I attribute to the conspiracy. That's correct. OK, that's really important. Tell me where to reread in Mangum. I just skimmed the thing because there's just too much to read. So tell me what piece of Mangum to read that will explain that to me. Just the page range. Yeah. Boy, I don't have that right at my fingertips. I got it right here. Yeah, you can see that Judge Sammartino took testimony on all of this and she recounted it. Right. Because what's her finding? Her finding is. So you can't tell me. All I wanted was I didn't really want anything except just tell me what page range to reread with more care than I did before. Right. So it is. I don't have the pages in front of me. I can look. OK, other people are going. But but the point of it is this, because we know we have confidence that what judgment or what Mangum did was right, because all we have to do is look at what Judge Sammartino found with respect to Dr. Johnson's methodology. Right. He ran the regressions customer by customer. And what did Judge Sammartino find? Undisputed that 94 percent of those customers that included Wal-Mart, all the big ones and all the small ones, all showing positive, statistically significant overcharge, well, positive overcharges. And then what she said is if you only consider the statistically significant results that Dr. was impacted to some degree by this, this price fix. And so if all we need to do and all Judge Sammartino needed to do was simply be persuaded, which she says she was at ER 18, that Dr. Mangum put forward a viable model. And then she compared it to Dr. Johnson's own results. And Dr. Johnson's own results showed that all or virtually all of the class there were there was there were not a great number in the words of Torres from the Ninth Circuit of potentially uninjured class members. So both experts actually came to the same conclusion. And once Judge Sammartino. Can you tell me what the reasoning was of Dr. Mangum or any other expert for why people who pay retail were nevertheless affected by the retail price? There is in the economics literature, Judge Kleinfeld, there is always a price dispersion from the, you know, the mass merchandiser group to the, you know, the local deli on the corner. And and it is just normal price distribution. The point of doing the regressions and the sub regressions, including down to the level of the customers, the way that Dr. Johnson did it. Hold on. You're not answering my question. You're just referring me to the fancy regressions. But you won't tell me what pages to read. And what I want to know is what do your experts say? I assume you've read all this stuff more carefully than I have. What do they say is the explanation for why the buyer direct purchasers who never pay retail are nevertheless affected by the is that they fix the list prices and the list prices serve as the baseline. There's plenty of case law out there in the antitrust, you know, in the antitrust cases. If that list price, that's the baseline upon which all of the negotiations happen, it does not matter that there is this normal price variation. As long as you can show. Wait a minute. If the list price goes crazy on tuna fish at some point, I'll buy locks and I'll never go back to the tuna fish. And it doesn't what you're saying doesn't make sense unless you amplify it. OK, so on that point, that last point, what the antitrust with the Supreme Court has said is the moment you purchase Hawaii versus Standard Oil 1972, the moment you purchase and it was at an inflated price, you're impacted. That's let me we need to we need to manage the time here a little. But let me try to help out Judge Kleinfeld's question and see if you can help me. Is there anything in this record under which there's some evidence, contrary to our intuitions, that this price affects negotiated prices? Mike White testified. Mike White was a witness that for chicken of the sea and one of the defendants and Dr. Mangum testified about what Mike White said at the hearing before Judge San Martino. OK, what do you say plays in the same sandbox? What did he say? Everybody plays in the same sandbox. That's that's a that's a I'm asking, did somebody say that list prices affect eventual negotiated prices or not? It may not be important. I just want to know. Well, that was the point of the sandbox comment. They all play in the same. I'm not asking you whether you made the sandbox comment. I'm asking whether somebody directly said that list prices affect negotiated prices. Well, we can see that from the regressions all the way down to Johnson, Dr. Johnson's customer. But with respect now, look, it may not make a difference. The regressions may be enough. I'm just trying to find out what the record says in this case. And you may know it better than I. So my question is, did somebody directly say, I know these your class members negotiate prices, but an inflated list price in the end will affect their prices? Or did they just conclude that based on the regression regression analysis? They concluded that they concluded it on the basis of the regression analysis. They are statisticians. OK, OK. That's look, I don't want you to. We're not arguing the weight of it. Judge Kleinfeld was asking a specific question, which is, did somebody say the list prices affected the eventual prices? And your answer is, well, they said it through their regression analysis. And all you're saying with that response is that where you have some customers to pay list and some that negotiate the total amount paid by all the customers will be higher if the list prices are fixed. That's all that that means. When you say regression analysis, that's all it proves. It doesn't prove anything about the people that never pay retail. It sure does, because if you run a regression, they're part of a group that on the whole, a group consisting of those who never pay retail and those who always pay retail. If the retail price is criminally raised, the aggregate for the group will be more. That's all it proves. If you only think about a pooled market, maybe that's true. But what Dr. Mangum did is he tested, he did more sub-regressions, as is stated in Judge Scamantino's opinion, including by customer type, big versus small, mass merchandisers versus food distributors. All of the different ways that the defendants categorize their business, all those sub-regressions, all show large and statistically significant overcharges. Mangum's conclusion was that the delta in each of these cases could only be attributed to the antitrust conspiracy, because he had removed from his analysis all other factors that might cause the difference in the delta. Yes, Judge Hurwitz, that's the point of doing the regression. Okay, all right. I think we've taken you well over your time. We're not going to punish your co-counsel for it. And so, Mr. Burt, are you second? Are you the on-deck hitter? I am, Your Honor. May it please the court. I represent the EPP class, that is the consumers class, and I can start off by answering the question that you and Judge Kleinfeld have just been asking. We know, for example, that Walmart paid an overcharge because our expert, Professor Sunding, measured just with the Walmart data to see if Walmart paid an overcharge based on their data from before the class period and after the class period, during the class period, and they did. It was a slightly different overcharge from the overcharge everybody else paid, but it didn't drop out. Even Walmart, with all of their bargaining power, all of their size. How come? There must have been an explanation in the report. How come? For sure. They do, in fact, have more bargaining power, but not enough to evade overcharge entirely. They paid a smaller overcharge, but they paid an overcharge. So then, Dr. Sunding took the top ten purchasers of tuna, the direct purchasers of tuna, times the three defendants each, and did a risk analysis to see if they all had statistically significant positive overcharges on their own, and every one of them did. I direct you to the record at ER 364. That's the testimony of the three-day hearing. Dr. Sunding said we checked them because we checked for bargaining power. We used net prices to make sure that it was net discounts and the discounts didn't matter. So to answer your question, Judge Kleinfeld, from before, what happens if the cruise ship has a separate deal? If an economist thinks there's a place that the experience might be different, so that if you don't pay list price, you don't have any injury, the economist is going to have to go look. And our expert took a figurative flashlight of robustness checks to go look for example, is Walmart so big and such a powerful bargainer that it doesn't pay an overcharge, but they pay an overcharge. Does an overcharge drop out when you change the supply? What you're saying is very helpful and very important, at least to me. Tell me more about what the theory was for why Walmart gets stuck with the overcharge. I would have thought Walmart doesn't care. They have more bargaining power than any other purchaser in the world. Well, the theory for why you check Walmart separately is that they're, you know, more than 20% of the market and they're huge and they might have so much bargaining power that their overcharge would go zero. But on empirically testing it based on data, we didn't assume that. We tested it and on testing it. I understand the empirical result that you're describing. What I want to know is what the economist theory was for why that result pertained. Oh, because the ability to shift list prices shifts all prices so powerfully because everybody bargains close to the list price. And he didn't assume that either. That's based on testing. Guys like Derek Parsons, who was a witness for COSI, our expert went through the testimony there was about how much variance. Mike White was only one. There were several other people that testified. Yes, there are individual negotiations, but the individual negotiations happen in a sandbox. The sandbox comment isn't just a soundbite. It means in between a list price and a net target that the salespeople have to get to, you get to a net price that you bargain to. Nobody really bargains very differently from the net that these buyers buy at. And, you know, we're not assuming that just based on theory or just based on the evidence. There's testimony, or just based on the test. There's testimony to that effect, and the experts checked it. And in going through that testimony and then testing to see if that's in fact true, the prices are closely correlated. Though he wasn't my expert, Mangum also does price correlations to show they work together. And they use net prices, net of the discount. So, for example, when the cruise line bargains for the hotel rack rate, what they end up with is a net price. If you know that the list price moves, but you don't know anything else, you don't really know anything. But if you then look at the net price and say, gee, actually, what these cruise ships end up paying, it's lower, but it's only 6% lower, give or take a percent. If it correlates closely because you empirically checked it, then there is actually an impact on them. Mr. Burt, it's a long record, and I can't remember every bit of it, but I thought there was also some expert testimony that one reason that people who negotiated prices were paying a higher price was because of the absence of competition on price as a result of the price-fixing agreement. Am I wrong in remembering that in the record, or was that your argument as opposed to the evidence? I think that's also correct, but I wish I could page-cite it. Okay. Why don't you take a minute and tell us what you wanted to tell us. Judge Bomette, to your question, if I had to try a case for an individual class member, I would put on that class member, say, Jade Canterbury from West Virginia, I'd put on that class member's testimony about her own purchases, when and where, but then to prove her individual case at trial, I would and would have to rely on a model that said, based on the basic economic supply and demand factors and the relationship between those and the price, that there was an overcharge. She can't do that from her purchases. The standard you were looking for, Judge Bomette, I think is the one that appears at 1046 of Tyson, and that says that what you need to show is prima facie case. Your common proof has to make that a prima facie case, right? And her prima facie case is, there's an overcharge all through this market, and in fact, that's what Professor Sunding testified at 355 in the record during the three-day hearing. He said, it's all through this, all through this class. We didn't, nor did we assume pass-through. Pass-through is based on nine separate models looking at big retailers, small retailers, national samples with market research data, and then also every single Kroger store, Walmart, nine different models on different data sources, taking that proverbial flashlight and looking for a place where the pass-through might drop out, and in fact, it doesn't drop out anywhere. Mr. Burt, yeah, we've taken you over time, and I apologize, but that's the nature of the 10 minutes aside. So I'm going to go to Mr. Caneo. There. You should be able to hear me. Good afternoon. I'm Jonathan Cuneo on behalf of the commercial food preparers. Now, we are the bodegas that Judge Kleinfeld was referring to, tuna in large sizes. They are signature products. They are in either 42-ounce or 66-ounce packages, and that's so that if you're making 100 sandwiches, you don't have to open lots and lots of cans. Now, because this is, how would you go about defining commercial purchasers? Well, the answer is that there is a special food service channel that each of the retailers gives. It's a separate department, in effect, that markets to us, and what we did is we defined it as the first purchaser from each of the six largest distributors. So it is a very confined class of strictly defined class. Now, because these are commercial transactions, there is an unusually rich data source, and so that for really the vast, vast, vast majority, 90 percent of our class, go through five of the six retailers. For Cisco and U.S. Foods, that comprises 60 percent of our class, about 62 percent, something like that. Now, in that case, we have transaction-by-transaction data that goes right through to the ultimate purchase by our class member, and our experts in that case found over 99 percent had experienced an overcharge. Now, let's talk about the rest. They buy from, for the most part, from Walmart, Sam's Club, and Costco, and I think we all know that you can't really negotiate with Walmart at the cash register, or the same thing with Costco. They charge list prices, and they say that in their annual reports. Discounting is not a factor. Now, let's talk about, so that, in my judgment, shoots down, and I want to make the court, two of the canards that are put up against our class, which were made only in a very muted way. The first is averaging. No, our case is based, for the most part, on 100 percent coverage of individual transactions. Second is negotiating power of individual participants, individual commercial food preparers. Well, that is all in the net prices. It's fully accounted for in the transactional data of our customers, and so there is, in that case, for the 60 percent, there is a, it's all there. It's baked in, and for the others, I think we can, and it's in their annual report, it's in the record, that you can't go into Walmart and I'll pay you a little bit less for these cans of tuna. So that our case for coverage is overwhelming, and even the defense expert, Dr. Hader, this is on page 38, I think, of the opinion below, found that she found positive statistical pass-through effects, just like we did. It's just a question of how much, and it's what it comes down to. And I think that I've addressed your questions, and I can even give back the nine seconds of my time, unless the court has something further for me. No, you get a gold star. You don't necessarily, doesn't necessarily mean you win, you just get a gold star. I want to talk some more then, okay. Thank you, your honor. Thanks for staying within time limits. Thank you. What, let's give, let's put three minutes on the clock for Mr. Gar. Thank you, your honors. I want to run through the various responses, but I want to say at the outset, this case turns on a basic legal principle of when you can present representative evidence in a class action to establish predominance, and you can't do it unless you can present it in an individual action. Tyson's Food says that, the First Circuit in Nassau said that, the Third Circuit in Lamictal said that. Now, let me respond. Could you respond to Judge Boumediere's question, because I think what he says, and what counsel says, well, I would present this in an individual action. What I would add to it is the actual price I paid, and that would establish my damages, but I would establish the overcharge through this sort of analysis. Why wouldn't that be done in an individual action? Right. Well, first, the most telling thing is his first response, which is, the first thing I would do is present the individual, and she would tell you everything about how she purchased it. That's completely absent in this model. It's been wiped out by the average assumption. That's in addition to the model. So the question is, would the model be admissible in an individual action, even if it wouldn't be enough to entirely make out the individual's case? And the answer is, no. What Tyson's Food says, Your Honor, is, and I'm quoting from pages 1046 to 47, if the sample could have sustained a reasonable jury finding, then in an individual action, it would be allowed in a class action. And I think if you look at how the court distinguished the Walmart case, where it acknowledged that the statistical study would have been admissible, but it said it in an individual action, but it said it wouldn't have been sufficient to establish that there was discrimination among all the different plaintiffs, and stores in that case. And therefore, the representative evidence couldn't have been allowed to establish predominance under Rule 23. So no, they haven't even argued. So tell me in an individual action, how the individual plaintiff establishes the amount of the overcharge. Your Honor, we have 100 of those actions, and every single one of those, the plaintiffs came forward and they presented their own data as to how they had been overcharged by the actual prices. They didn't rely on Mr. Magnum. I'm sorry, I'm going back to individual actions. Didn't they come in and say, before the conspiracy, we paid this. After the conspiracy, we paid that. We've taken out of the prices, inflation and all the other things that might have otherwise given rise to the larger one. And this is our damage. Isn't that what they did? The key point of your question, Your Honor, is they paid based on their individual circumstances. All of that is wiped out by the averaging assumption. The averaged lumps in the bodegas and the Amazons and the Costco's, all together as if they're the same and they all suffered impact. And we know the question is, how would the individual prove the overage in the individual case? That's that's the question we're trying to get at. Right, Your Honor. And they would they would they would show what price they negotiated, show that they actually negotiate, had to negotiate a higher price and paid a higher price as a result of the conspiracy. That evidence is available. And with respect to the individual, that's the conclusion. How would they show that on that Walmart? What is your response on what Mr. Burt said about the study of what Walmart paid? Right. So, Your Honor, the response is they cherry picked one purchaser, Walmart, and ran the model on that. They ignored Costco, Amazon, Dollar General, you know, countless others. And again, when our expert ran the model and allowed the average overcharge to vary based on purchaser, he found that they couldn't establish impact for 28 percent of the class. The 98 percent figure is just math games, Your Honor. That 98 percent figure is backing out 160 members of the class for which they could not establish impact when Dr. Johnson ran the model. And if you look at page ER 16, they're talking about 442 members, but that excludes 160. And of those 160, 101 involve situations where they couldn't show a statistically significant overcharge, which means that it was too close to the line, both below a negative overcharge and above. So those were precisely the class members who are most likely not to have been impacted. And they simply backed them out and talk about the other ones. They haven't come close to establishing impact on a class-wide basis. And that's why they had to use these gross averaging assumptions, taking the information as the class to a hold. Your Honors, I would like to give you some citations to help you out, if that'd be possible. For Mr. Magnum, Judge Kleinfeld, I would urge you to look at pages 2018 to 19 of the record For Mr. Sundin, I would urge you to look at pages 2191 to 92 and 2229 that shows the averaging applied at both the initial and the pass-through. And for Mr. Williams, I would urge you to look at 1854 to 61. Also on page 1717, it shows that there was individual negotiations with respect to the commercial food preparers. And on the individual negotiation points, and this is a really important point, the evidence shows that ER 1120, 1130 to 31, 1711 to 14, that prices were negotiated individually. Some companies like Dollar Tree, 1147, did not even start with the list price. Some companies used bidding processes to negotiate prices. ER 561, 11188, 18 to 19, 1129. Mr. Garrett, you're well over the additional time I gave you, so if you have supplemental citations to file, use our rule and file supplemental citations, and the other side will have an opportunity to respond to them. Thank you, everyone, for your arguments in this interesting case and your briefing. And this case will be under submission. Thank you, Your Honors.
judges: Kleinfeld, Hurwitz, Bumatay